UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

VAM CHECK CASHING CORP.,

    Plaintiff

– against –

FEDERAL INSURANCE COMPANY,

    Defendant.

**MEMORANDUM AND ORDER**

10-CV-1529

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAY 27 2011 ★

BROOKLYN OFFICE

**Appearances:**

| | |
|---|---|
| For Plaintiff: | Clayman & Rosenberg<br>New York, NY<br>By:   Paul Scott Hugel |
| For Defendant: | Frenkel Lambert<br>New York, NY<br>By:   Arthur N. Lambert<br>       Diane Duszal |

**JACK B. WEINSTEIN, Senior United States District Judge:**

I. Introduction ................................................................................................................ 2
II. Facts .......................................................................................................................... 2
  A. Fraud against VAM ............................................................................................. 3
  B. Insurance Policy .................................................................................................. 5
  C. Federal's Denial .................................................................................................. 5
III. Law ........................................................................................................................... 5
  A. Summary Judgment ............................................................................................ 5
  B. New York Law Governs ..................................................................................... 6
  C. Ambiguity Construed Against Insurer ................................................................ 6
  D. "Robbery" under the Policy ................................................................................ 6
    1. "Overt" ............................................................................................................ 7
    2. "In the Presence of" ........................................................................................ 9
    3. "Felonious" ..................................................................................................... 9
    4. "Cognizance" ................................................................................................ 10

    i. Federal's Definition................................................................................................. 10
    ii. Legal Definition..................................................................................................... 11
    iii. VAM's Definition.................................................................................................. 12
IV. Application to Facts ........................................................................................................ 12
   A. "Overt" ........................................................................................................................ 12
   B. "Cognizance" ............................................................................................................. 13
V. Conclusion ....................................................................................................................... 15

## I. Introduction

Vam Check Cashing Corporation ("Plaintiff" or "VAM") sued Federal Insurance Company ("Defendant" or "Federal") for failure to provide insurance coverage on a loss of $120,000 after imposters defrauded the company. Federal denied coverage claiming the loss did not come under the policy's "On Premises" clause because the incident did not constitute a "Robbery." Both parties filed motions for summary judgment.

At issue is the meaning of "Robbery" as used in the insurance contract. The case illustrates why insurance companies should use plain English. Reliance on the legalisms "overt" and "cognizant of" created an ambiguity supporting a decision in favor of the insured. *Cf. David v. Heckler*, 591 F. Supp. 1033, 1043 (E.D.N.Y. 1984) ("The language used is bureaucratic gobbledegook, jargon, . . . insurancese, and doublespeak.").

For the reasons stated below, VAM's motion is granted and defendant's motion is denied.

## II. Facts

VAM operates a check cashing business in Brooklyn. It is one of three such enterprises owned by the same person. Plaintiff's Memorandum of Law, 1, n.1, March 25, 2011 ("Pl's Mem."). Pine Check Cashing, one of the establishments, is where the incident occurred. All three locations are insured under the same insurance policy. *Id.* Federal's policy insured against

2

losses due to "Robbery" within plaintiff's premises. *See* Pl's Ex. C at 1.2 (B)(2) (Insurance Policy).

Plaintiff contends that a defined robbery occurred at its business when imposters tricked a cashier into handing over $120,000. Compl. at ¶ 9–10. Because she was not aware that a fraud or crime was taking place, defendant contends the incident does not constitute a "Robbery" under the policy. Defendant's Memorandum of Law, 16–18, March 25, 2011 ("Def. Mem.").

### A. Fraud against VAM

The cashier was working at Pine Check Cashing with a co-worker. She received a call from a woman ("First Unknown Female") who falsely identified herself as the wife of VAM's owner. The cashier had never met or spoken with the owner's wife. The First Unknown Female informed the cashier that she and the owner were on their way to the Pine Check Cashing Corp. store; that the owner was planning a meeting to announce the opening of three new stores, including one in Manhattan that same morning; and that he wanted to make the cashier manager of a new store, with an increased salary and benefits. Def. Ex. 5; Pl. Ex. H.

The cashier placed the First Unknown Female on hold to take a call on another line from a second woman ("Second Unknown Female"), who identified herself as the manager of the new Manhattan store. The Second Unknown Female asserted that her store needed cash to pay a representative of New York State who was on her premises to collect a property tax. The cashier put the new caller on hold to relay this message to the First Unknown Female, who instructed her to tell the Second Unknown Female to send a man to the Pine Check Cashing Corp. store to pick up the money. The cashier complied, and the Second Unknown Female hung up. Pl. Ex. H.

The First Unknown Female remained on the line instructing the cashier that "some guy named Mr. Windfrey was going to come by to collect $100,000 that [the owner] has to give him

3

and that [the owner] would replace it when he gets here because Mr. Windfrey can't wait for him." She went on to explain that "Mr. Windfrey" would provide the code "2810;" that she, the "wife," would stay on the phone until he arrived; that the cashier was to put the money in a box and tape it; and that the owner would give the cashier a $500 bonus. At one point the First Unknown Female pretended to ask her "husband" the amount again, and someone with a "low voice" said $120,000. *Id.*

The cashier described handing over the money as follows:

> So before "Mr. Windfrey" came in the store two guys came in the front, looked in, then "Mr. Windfrey" came in straight to the door. I had a customer at the time so he went to [the coworker's] window, asked for the manager and [the coworker] looked at me and I told her to send him to my window. My customer left[;] then the [con man] came to my window. I asked for the code and he said 2810 so I buzzed him in, [with] the [first unknown] female still on the phone. I went to shake his hand when he held back a little, positioned his hand slightly. At the time I was unaware of what was really going on I just thought maybe he was crippled. The box was not ready so I went to tape it and gave it to him. I ask[ed] "do we get some kind of receipt" and he said "that's all." The woman on the phone told me not to keep him waiting so he left and then she said she will see me soon and finally got off the phone.

Pl. Ex. H.

The cashier did not discover that these events constituted a scam until hours later when she called the actual owner. He told her that she had been communicating with imposters. *Id.* She then contacted the police.

The cashier never felt threatened by Mr. Windfrey, "the messenger;" she did not believe he was dangerous or a thief. Def. Ex. 6, 47–49; Def. Mem. 5–7.

4

### B. Insurance Policy

Federal issued a "Crime Insurance Policy for Check Cashers," No. 8077-9716 (the "Policy"). It had a $150,000 coverage limit and a $7,500 Deductible. Def. Ex. 3. The Policy provides in pertinent part:

> 1.2 The Company shall be liable for direct losses:
> ....
> B. Within the Premises of Money ... only when such loss is caused by:
> (2) Robbery or attempt threat[.]

*Id.*

Pursuant to Policy Section 6. "Policy Definitions,"

> "Robbery" means the unlawful taking of insured property from an Insured, a partner, an Employee or any other person authorized by the Insured to have custody of the property by violence, threat of violence or other *overt felonious act committed in the presence and cognizance of such person* ....

*Id.*

### C. Federal's Denial

Federal denied VAM's claim on the ground that there was no coverage because the fraud did not meet the Policy definition of "Robbery." Def. Ex. 14. VAM sued. *See* Complaint, Apr. 7, 2010.

## III. Law

### A. Summary Judgment

Interpretation of an insurance policy presents a question of law appropriately decided on a motion for summary judgment. *See McGinness v. Employees Reinsurance Corp.*, 648 F. Supp. 1263, 1266 (S.D.N.Y. 1986). *See also, e.g., Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

### B. New York Law Governs

A federal action based upon diversity jurisdiction, brought to recover under an insurance policy, is governed by state law. *See, e.g., Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Brocklesby Transport v. Eastern States Escort*, 904 F.2d 131, 133 (2d Cir. 1990). New York law applies. *See* Pl. Mem. 7; Def. Mem. 10–11.

### C. Ambiguity Construed Against Insurer

Under New York law, "[a]n insurance policy is a contract . . . [to] be construed to effectuate the parties' intent as expressed by their words and purposes." *American Home Products Corp. v. Liberty Mut. Ins. Corp. [AHP]*, 565 F. Supp. 1485, 1492 (D.C.N.Y. 1983). In the case of an ambiguity, the court will construe uncertainty against the insurer. *Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 353 (1978); *see also, e.g., Uniroyal, Inc. v. Home Ins. Co.*, 707 F. Supp. 1368, 1376 (E.D.N.Y. 1988) ("New York adheres clearly and unequivocally to the hornbook rule that policies of insurance, drawn as they ordinarily are by the insurer, are to be liberally construed in favor of the insured.") (citations and internal quotation marks omitted).

### D. "Robbery" under the Policy

The Policy covers a "Robbery," as defined by the instrument, not by criminal law; violence or fear by the victim is not required. The meaning of "overt act" and "cognizance of" is critical. The policy definition of Robbery is:

> The [1] unlawful taking [2] of insured property [3] from . . . any [cashier] [4] authorized to have custody of the property . . . by [5] *overt felonious act* [6] *committed in the presence and* [7] *cognizance of* [*the cashier*]. . . .

6

Pl. Ex. C. 10. (emphasis added). All seven elements need to be established. Only [5] "overt felonious act," and [7], "cognizance of" the [cashier], are in dispute. The question is whether an act of the imposters duping the cashier into handing over $120,000 constituted an "*overt felonious act committed in [her] presence and cognizance. . . .*" *Id.* (emphasis added).

The New York Penal Law defines Robbery as follows:

> Robbery is forcible stealing. A person forcibly steals property and commits robbery when, in the course of committing a larceny, he *uses or threatens the immediate use of physical force* upon another person for the purpose of:
>
> 1. Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or
> 2. Compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny.

N.Y. Penal Law § 160.00. (emphasis added). It assumes such force or threat or apprehension as will alert the victim that a crime is being committed in her presence. *See also* American Law Institute, Model Penal Code § 222.1 (1985) ("Model Penal Code").

In the Policy, awareness of a threat or force is not implied from the use of the word "Robbery". Since force, violence, or apprehension is not required by the Policy definition, precedents under Penal Law section 160.00 are irrelevant. *See Thomas J. Atkins & His Five Sons. Ltd. v. Mass. Bonding & Ins. Co.*, N.Y.S.2d 446, 447 (2d Dep't 1995) (reversing trial court decision for incorporating elements of criminal law into policy that provided its own definition of robbery).

**1. "Overt"**

In criminal law "overt" refers to an act in furtherance of other conduct. Section 5.03(5) of the Model Penal Code provides: "<u>Overt Act.</u> No person may be convicted of conspiracy to

7

commit a crime, other than a felony of the first or second degree, unless *an overt act in pursuance of such conspiracy* is alleged and proved to have been done by him or by a person with whom he conspired." (emphasis added). Similarly, the New York Penal Law provides: "A person shall not be convicted of conspiracy unless *an overt act is alleged and proved to have been committed by one of the conspirators in furtherance of the conspiracy.*" *See* N.Y. Penal Law § 105.20 (emphasis added) [Conspiracy; pleading and proof; necessity of overt act]. "Overt," in the criminal context does not require that the act be "open" or "apparent."

Uses of "overt" outside of the criminal context do not require the act to be "open, apparent, or in view." For example, Roget's International Thesaurus, (3d ed. 1962) provides the following synonyms for "overt act": "act, action, deed, do [coll.], doing, thing, thing done, feat, stunt [coll], exploit, adventure, enterprise, achievement, accomplishment, performance, transaction, proceeding, job, gest or gests, step, measure, maneuver, bout, turn, passage, effort, move, coup, stroke, blow, touch . . ." Roget's § 703.3. Openness is not implied.

Federal contends that for the purposes of the robbery coverage, "overt" modifies "felonious" and "act." Thus, not only must the act be visible and apparent, but the criminal nature of the act must also be evident to the observer, here the cashier. In this case, two imposters deceived the cashier into handing over $120,000 to a third in a complex conspiracy. Likening the conduct to a "larceny by trick," Federal contends that the deception was not open to view because the cashier had no idea a felony was being committed when she talked to the imposters and turned over the money. *See* Hr'g Tr. 3–5, May 19, 2011 ("This [act] was anything but overt. This was an act of deception.")

The defendant's position is contrary to the general view of an overt act in conspiracy; required is only that it be any substantial act that furthers the goals of the conspirators. It need

8

not itself be criminal. *See* Hr'g Tr. 8–9. When conspirators take a taxi to a bank they intend to rob, paying the fare, they are committing an overt act that appears to the observer to be legal.

When the con man came to the store and took the money from the cashier this constituted an overt act under the policy; as part of the conspiracy it was felonious. The person who observed the act does not need to know it was part of a felony—conspiracy to defraud—; conspiracies like this one are generally secret. *See* Explanatory Note to Model Penal Code § 5.03(5) at 80.

### 2. "In the Presence of"

"In the presence of" means that an overt act occurred while the custodian of the property—here the cashier—was present at the scene. *See, e.g.*, Webster's New Collegiate Dictionary (1980) ("presence" as "the fact or condition of being present."). New York does not require physical presence throughout the duration of the actions constituting the crime. *Cf. Buffalo Smoketeria Inc. v. Metropolitan Casualty Ins. Co. of New York*, 258 N.Y.S. 581, 582 (N.Y. Sup. 1932) ("courts have not construed the word 'presence' to mean a literal, physical presence.").

It is agreed that the act occurred in the presence of the cashier.

### 3. "Felonious"

It is conceded that the wrongful taking of $120,000 with intent to steal was felonious. *See, e.g.*, Black's Law Dictionary (4th Ed. 1968) (definition of felonious as "a technical word of law which means done with the intent to commit crime; of the grade or quality of a felony.").

9

### 4. "Cognizance"

#### i.   Federal's Definition

Federal argues that for the "overt felonious act" to be committed in "the presence and cognizance" of the cashier, she not only needed to be physically present when a felonious act took place, but she must have known that something criminal was occurring. Def. Mem. 13–16. It relies on New York Jurisprudence's explanation: "[t]he phrase 'actually cognizant,' as used in some robbery insurance policies, has been construed by the courts to mean, fairly literally, that the victim must have actually known that something wrong was going on before the complete consummation of the crime, or at the time of the crime, and not merely, by inference, as an afterthought." N.Y. Jur. 2d Insurance § 1595; *See also* Hr'g Tr. 6, 10. New York Jurisprudence is misleading.

There are few reported cases in New York interpreting robbery insurance policies. In *Lorenz et al. v. Indemnity Ins. Co. of North America* the appellate term reversed a trial court judgment for plaintiff granting coverage under a robbery insurance policy. 94 N.Y.S.2d 25 (N.Y. Sup. 1949). The plaintiff's messenger testified that he had placed money in his back pocket and discovered later that his pocket was empty and unbuttoned. *Id.* The policy defined robbery, *inter alia*, as "a felonious and forcible taking of insured property . . . by any other overt felonious act committed in his presence and of which he is actually cognizant . . ." *Id.* at 21 (internal quotations omitted). The court held, "[i]t plainly appears that at the time of the robbery plaintiff's messenger or agent was not actually cognizant of the commission of the alleged felonious act as testified; indeed he was not aware of such act." *Id.* at 22. This case is not helpful. "Cognizance" was not interpreted as requiring knowledge that the act committed was

criminal conduct as defendant suggests. The court found only that in order to recover the victim of the robbery must know that the physical act was being committed.

In the instant case, the fraud was being perpetrated in the cashier's presence and she was "aware of [at least one felonious] act." *Id.* The incident at issue would pass the standard provided in *Lorenz*.

Other cases cited by defendant are also unavailing. *See* Def. Mem. 12–16 (citing *Buffalo Smoketeria Inc. v. Metropolitan Casualty Ins. Co. of New York*, 258 N.Y.S. 581, 582 (N.Y. Sup. 1932) (addressing the meaning of "in the presence of a custodian" and holding "courts have not construed the word 'presence' to mean a literal, physical presence."); *G. Edelstein & Co., Inc. v. Ambassador Ins. Co.*, 86 A.D.2d 83 (1st Dep't 1982) (granting coverage under robbery policy where violent crime caused loss; no interpretation of "cognizance"); *Goldner v. U.S. Fidelity & Guaranty Co.*, 226 A.D. 560 (1st Dep't 1929) (denying coverage on ground of a policy exclusion limiting coverage if property is stolen from a show window by any person who breaks the glass; no interpretation of "cognizance")).

### ii. Legal Definition

Black's Law Dictionary defines "cognizance" as "[a] court's right and power to try and to determine cases." Black's Law Dictionary 712 (9th Ed. 2009) at 295–96. Its third definition of "cognizable" is "capable of being judicially tried or examined before a designated tribunal; within the court's jurisdiction." *Id.* In the Compact Oxford English Dictionary (2d ed. 1989), the third definition of "cognizance" is "[t]he action of taking judicial or authoritative notice; the hearing and trying of a cause."

In the context of the Policy, "cognizance" under these definitions can be construed to require control or power over the object in question. This definition is not duplicative of phrase

11

[4], "authorized to have custody of the property," since the word "cognizance" implies more than authorization; it includes actual custody.

The cashier had custody and control over the money she turned over to one of the imposters. "Cognizance" was satisfied.

### iii. VAM's Definition

VAM argues that "cognizance" only requires awareness that the act is taking place, not that the act was criminal. *See* Pl. Mem. 12; Hr'g Tr. 9–11, 12. It relies on the Webster's Dictionary definition "a) surveillance, control; b) apprehension, perception; c) range of apprehension; d) notice, observance." *Id.* (citing Webster's New Collegiate Dictionary (1980)). It points out that Federal's definition had

> [t]he peculiar effect of making coverage potentially dependent upon the ability of the custodian to identify acts that are in the furtherance of a felony grade crime. If an insured employs a custodian who lacks the legal acumen needed to distinguish a felony from a misdemeanor from a violation, it runs the risk of a disclaimer due to its custodian's lack of "cognizance."

Pl. Mem. 13–14.

This argument is also persuasive as a basis for rejecting Federal's defense.

## IV. Application to Facts

### A. "Overt"

In the context of the Policy the term "overt" does not require that the felonious nature of the act must be "apparent" or "open to view." In this case, where there are ambiguities and terms left undefined, criminal law is at least suggestive of an ambiguity. Under the New York Penal Law and Model Penal Code "overt"—whether open or not—is an act in substantial furtherance

of other conduct—a conspiracy. That definition is appropriate within the context of an insurance policy designed to protect check cashing businesses from fraud.

The act of two women calling the cashier at Pine Check Cashing to establish the scheme and of another individual posing as VAM's agent in order to receive money that did not belong to him were "overt" within the meaning of the Policy.

### B. "Cognizance"

Federal chose to use the esoteric term "cognizance." Its definition of "cognizance"— requiring knowledge of the observer that what were apparently lawful transfers of money within an enterprise constituted a crime in progress— is not supported "in the context of the policy as a whole, the purposes sought to be accomplished, and the relevant surrounding circumstances." *AHP*, 565 F. Supp. at 1493. The Policy's "Robbery" coverage is designed to compensate for losses of the kind suffered by plaintiff. Requiring the insured to show not only that the act occurred in the cashier's presence, but that she was aware that the act was criminal, defeats a central purpose of a Policy designed to protect check cashing establishments against manifold risks from nefarious scoundrels operating where cash is available. *See, e.g.*, Willie Sutton's suggestion to rob banks because "[t]hat's where the money is." *The Yale Book of Quotations* 739 (Fred R. Shapiro ed., 2006).

An appropriate definition of "cognizance" used in the policy is that it requires the individual to have power or control over the item taken. The cashier fell prey to an elaborate and sophisticated scheme to defraud plaintiff. Execution of this calculated plan occurred in her presence. It worked. And she had control over the money she turned over to the criminals. The cashier need not have been aware that the company was being defrauded at the time of the

incident. Such a requirement would defeat much of the purpose of buying a "Crime Insurance Policy for Check Cashers."

> It was obviously written with an understanding of the types of risks to which check cashing stores are exposed. A clear risk for any check cashing business, one that it faces numerous times every day, is that it will be defrauded by paying cash for a forged or fake check.

Pl. Mem. 14. Under Federal's definition there could be no coverage for such incidents unless the perpetrator made clear that he was committing a crime by wielding a weapon or making a threat, or by announcing that he was committing a felony. Clear statements of a crime in progress from aspiring criminals are not likely; this was demonstrated in the famous bank scene of *Take the Money and Run* (1969), where Woody Allen tried—without success—to convince a teller that he was committing a crime.

Given that the Policy has separate coverage for violence or a threat of violence, Federal's definition would render the robbery by non-violence coverage superfluous in cases such as the instant one.

Insurance companies are required to be meticulous when drafting their policies to ensure that language, which can be readily understood by a person of average intelligence, is used. *See Heckler*, 591 F. Supp. at 1042 ("The evidence at trial clearly established that the review notices could not be understood by the great majority of beneficiaries who received them."). If Federal wanted to exclude coverage for check cashers under the circumstances in this case, it could have explicitly stated that the "felonious act" must occur "in the presence of" and "with the awareness or knowledge of such person that the act was part of a felony." In the alternative, it could have created an explicit exclusion for incidents of deceptive fraud, larceny by trick, or other

14

circumstances where the insured is unaware that he or she is being duped into giving away money.

V. **Conclusion**

For the reasons stated plaintiff's motion for summary judgment is granted. Defendant's motion for summary judgment is denied. No costs or disbursements.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date: May 25, 2011
Brooklyn, New York

15